No. 25137

**The People of the State of Colorado v. Oscar Armstead, Jr.**
(501 P.2d 472)

Decided September 11, 1972.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, David A. Sorenson, Assistant, for plaintiff-appellee.

Samuel D. Menin, for defendant-appellant.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

The defendant filed a motion for post-conviction relief, under Crim. P. 35(b), alleging that (1) post-conviction lie-detector tests conclusively demonstrated his innocence, and (2) his right to due process was violated by certain perjured testimony of two prime prosecution witnesses and the intentional or negligent failure of the prosecution to disclose a medical report that was contradictory to the prosecutrix' testimony. From the denial of that motion, he appeals. We reverse.

Appellant was convicted of kidnapping and rape in 1966. Those convictions were affirmed by this court in *Armstead v. People,* 168 Colo. 485, 452 P.2d 8 (1969). The defendant's present counsel did not represent him at the trial.

I.

At the 35(b) hearing, the defendant offered into evidence the results of a set of polygraph examinations to which he had submitted after his conviction. The set of four tests was administered by a highly qualified private polygraphist. This examiner concluded his report as follows: "It is further the opinion of this examiner, who has worked with all branches of law enforcement in the State of Colorado, that the subject is innocent of the crime of which he has been convicted." The court received the report in evidence "for whatever weight might be given to it" in conjunction with the other testimony at the hearing. From its ruling, we infer

that the trial court found the polygraph evidence to be of little weight, a finding it was fully entitled to make as the trier of facts. The defendant does not contend that polygraph results should be regarded as conclusive, but argues that it was error to "disregard" them. The latter contention seems congruent with the first. If there be any difference, we do not accept either.

## II.

We find somewhat more merit in defendant's second allegation in support of his 35(b) motion that his conviction should not stand because of the quite possibly perjured testimony presented at trial.

Some of the testimony at trial was as follows: The prosecutrix' boyfriend testified that he called for the prosecutrix at around 8:30 p.m., on Friday, September 9, 1966, and they went to a bar for two hours, leaving there at 11:30 p.m. The prosecutrix was quite positive that they had left her house at 11 p.m. They both testified that they had been lost in the City of Aurora, which adjoins Denver on the east. The boyfriend testified that they were lost for a period of two hours. He had grown up in east Denver.

The boyfriend then parked the car. On direct examination the boyfriend stated that after they had parked he moved to her side of the car, where they talked for 30 to 45 minutes. He further testified that the defendant broke in the left car window, unlocked the door on the driver's side and forced the prosecutrix to go with him using a weapon which appeared to be a box cutter. On cross-examination, the boyfriend stated that the time during which they sat in the car was one or two hours, the abduction having occurred between 2 a.m. and 3 a.m. The boyfriend related that for the first 10 minutes after parking he and the prosecutrix occupied the two front seats, which had a console between them. After that, he stated that he moved around and sat on her side next to the door, with the prosecutrix sitting next to the console and partly on it. Regarding their activities while thus seated, he stated that they were only talking, that "you might say we were a little passionate, but that is about all."

His recollection of the defendant's car was that it was a 1957 or 1959 Mercury, two-tone, possibly cream and yellow in color. He obtained his view of the car from a distance of one block as it drove away at high speed in the dark. A police officer who interviewed him on the day following the alleged attack testified that his description then was that the car was light blue with a dark blue top.

The prosecutrix' recollection of that evening was quite similar. Her testimony on direct examination was:

"We were both sitting in the front seat on my side of the car. Russ was sitting next to the door and I was sitting kind of like in the middle and we were talking and — and we weren't carrying on real bad or anything."

She gave no description of her assailant's car on direct examination and on cross-examination stated first that she never gave any description of the car to the police and that she hadn't noticed anything about it. Further cross-examination was as follows:

"Q Did the police ask you to describe the car you were attacked in?

"A Yes.

"Q Did you describe the car for them?

"A Yes, but I wasn't sure of it.

"Q Did you tell them it was a '57 or '59 Mercury, two-tone, cream car?

"A Yes.

"Q Was that your recollection of the car or was that the description your boyfriend gave you?

"A That was Russ's description. I thought it was a Buick . . . ."

(There was other testimony at the trial tending to show that neither prosecutrix nor her boyfriend were ever taken to see the defendant's car. They were present at a lineup and heard the defendant describe his car. The defendant did not then mention the fact that on the night in question his automobile was smashed all along the right side and the left front door was caved in. Neither the prosecutrix nor the boyfriend mentioned any damage in their descriptions of the car.)

Immediately following the alleged attack, the prosecutrix described her attacker to the police as a negro in his early twenties. She made no mention of a moustache or a goatee, but only of a scar on his right cheek. (The defendant was 33. He then had a moustache and there was testimony that he also had a goatee. He had no scar on his right cheek.)

The police took the prosecutrix to Denver General Hospital for an examination. The doctor who there examined her testified that sperm was present in her vaginal canal.

At the 35(b) hearing the same doctor testified that he made the following notations at the time he examined the prosecutrix:

"The patient is a 20 year old, 'gravida 4, para 2, aborta 2,' stillborn 1, Caucasian female, 1 living child, who has taken C-Quens for contraception purposes. Her last missed period began the 17th of August. She presents with the complaint, 'I have been raped.' Inquiry reveals patient was parked with her boyfriend and had just completed the act of intercourse when a man smashed the car window, pulled a knife and threatened them, if she did not accompany him to his car. She then complied and was driven to a vacant lot, whereupon he threatened her again. She then unbuttoned her blouse and bra at his request and pulled up her skirt. Her girdle, panties, etc., had been removed for the boyfriend and she had not been allowed time to put them on before being abducted. She further states that the abductor requested her to eat him and blow him and she did. She further states, 'He screwed me.'

"Inquiry reveals that neither her boyfriend or abductor had used a condom and that her boyfriend had not had a vasectomy. She states that she was in no way injured, but complied upon threat of injury. Past medical history is not remarkable. Has had psychiatric counseling, appendectomy and tonsillectomy."

The doctor further testified that the presence of sperm, as to which he testified at the trial, was useless in proving a rape if she had just completed having intercourse with her boyfriend. When asked why he did not give this information

at trial, the doctor stated that he thought he was "not to volunteer information unless it's asked." He testified that he and prosecutrix had communicated clearly, and that he had accurately recorded her statements on his record. He stated that she was quite matter-of-fact during the examination, although that was unusual for a rape victim.

Her testimony was that while at the hospital she alternated between hysteria and "passing out."

A private investigator testified that in a conversation with the prosecutrix after the first trial, she admitting having just completed intercourse before the attack and further stated that she had told the doctor and later the trial prosecutor of this fact.

The investigator testified that he told the boyfriend of these statements of hers, to which the boyfriend's reply was "Oh, did she admit that?" and he refused to discuss the matter further until he spoke to the prosecutrix.

At the 35(b) hearing, the prosecutrix and her boyfriend testified that the investigator and doctor were both mistaken, that they had not had intercourse that night or made the statements ascribed to them. The prosecutrix' testimony was that she had had intercourse with the boyfriend the previous night, and that the doctor and investigator apparently misunderstood her statements to that effect. This act, she testified, took place at her house the Thursday night before she was abducted and raped. The boyfriend had testified at the original trial that he worked that Thursday evening from 5 p.m. until 3 a.m. When cross-examined upon this apparent discrepancy, he stated that he did not know at what time on Thursday he had had intercourse with the prosecutrix at her house. Further questioning was prevented by the court's ruling that the interrogation should be confined to the contents of the 35(b) motion.

The boyfriend testified firmly and repeatedly that he and the prosecutrix had been in the *back seat* of his car for two hours prior to the attack.

The prosecutrix declined to submit to a polygraph examination concerning whether she had had intercourse

with her boyfriend on Friday night.

The trial court at the 35(b) hearing made the following finding in denying the motion of appellant: "[T]here is no deliberate perjury submitted on behalf of the People as to the testimony of those two witnesses [prosecutrix and her boyfriend] . . . ."

This opinion in no way alters or modifies our opinion in the original *Armstead.* The principal thrust of that opinion was that there was sufficient evidence to support the verdict and that, therefore, we as a reviewing court could not disturb it. The prosecutrix made a positive in-court identification of the defendant. There was in evidence a latent blurred palm-print fragment from the roof of the boyfriend's car which, in the opinion of a police expert, was that of the defendant. Also, there was testimony that the defendant and his fellow employees used box cutters in their employment and usually took them home with them. This evidence, combined with the testimony of the prosecutrix and her boyfriend and the testimony affirming the presence of sperm, supported the verdict.

In contrast, we have here a question of after-discovered evidence which, if believed, negates the highly corroborative effect of the presence of the sperm. It cannot be said with certainty that the jury would have convicted the defendant if it had had before it the doctor's testimony which he gave at the 35(b) hearing. Further, there is presented here the possibility of perjury on the part of the prosecutrix and her boyfriend. In that connection, it is now proper for us to view the inconsistencies in the testimony of these two. Had the jury had before it the testimony presented at the 35(b) hearing, it is conceivable that it would have concluded that the prosecutrix and her boyfriend falsely testified to material facts and that all of their testimony should be disregarded.

This is a unique case. If with the later discovered evidence the jury would not have convicted the defendant, it can be said that the conviction can be laid at the door of inadequate preparation on the part of both sides. This to us has the magnitude of a failure of due process. *See Brady v.*

394

*Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). As we said in *Constantine v. The People,* 179 Colo. 202, 499 P.2d 309 (1972) "The ultimate distillation as to whether the due process right of the defendant was violated is whether we believe that there was a denial of fundamental fairness." Our view that there was a denial of fundamental fairness is fortified to a certain extent by the philosophy behind 1971 Perm. Supp., C.R.S. 1963, 40-1-510(1) which contains the following ground for post-conviction relief:

"(e) That there exists evidence of material facts, not theretofore presented and heard, which, by the exercise of reasonable diligence, could not have been known to or learned of by the defendant or his attorney prior to the submission of the issues to the court or jury, and which requires vacation of the conviction or sentence in the interest of justice:"

The matter of whether or not this statute, which became effective on July 1, 1972 should be given retrospective effect has not been argued before us, and we do not pass on the question of retroactivity and whether this statute could be applied here. We merely say that this shows a legislative intent that in situations such as this, at least for alleged crimes committed after July 1, 1972, post-conviction relief may be granted.

The judgment is reversed and the cause remanded with directions to grant the defendant a new trial.